AO 91 (Rev. 11/11)   Criminal Complaint (approved by AUSA Sean McDonnell)

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of Pennsylvania

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. 17-1562-M |
| RENARD GRAY | ) | |
| | ) | |
| | ) | |
| | ) | |

_Defendant(s)_

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ October 2, 2017 _____ in the county of _____ Philadelphia _____ in the
_____ Eastern _____ District of _____ Pennsylvania _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 922(a)(1) | Dealing in firearms without a license |
| 21 U.S.C. Section 841(a)(1)(b)(1)(B) | Distribution of 28 grams or more of cocaine base ("crack") |

This criminal complaint is based on these facts:
See Attachment A

☐ Continued on the attached sheet.

_____
_Complainant's signature_

Charles M. Ramsey, ATF Special Agent
_Printed name and title_

Sworn to before me and signed in my presence.

Date: _____ November 18, 2017 _____

_____
_Judge's signature_

s/ Linda K. Caracappa by S. McDonell (AUSA) per
telephone authorization
on Nov. 18, 2017 at 4:00 pm

City and state: _____ Philadelphia, PA _____

Hon. Linda K. Caracappa, Chief Magistrate Judge
_Printed name and title_

**ATTACHMENT A**

**AFFIDAVIT IN SUPPORT OF**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Charles M. Ramsey, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent for the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). I am currently assigned to ATF Philadelphia Group VII, which is a Firearms Enforcement Group whose primary responsibilities include investigating violent crime through the interdiction of firearms being possessed by violent criminals in Philadelphia, Pennsylvania. During this time, I have successfully completed the Criminal Investigator Training program (CITP) as well as the Special Agent Basic Training program (SABT). As a result of my training and experience, and that of my fellow investigators, I am familiar with investigations involving violations of federal firearms laws, and I am familiar with federal search warrants and searching for and seizing evidence in accordance with the probable cause set forth in supporting affidavits.

2.      As a Special Agent with ATF, I am vested with the authority to investigate violations of Federal law, including Title 18, 21, and 26 of the United States Code.

3.      As part of my duties, I participated in the investigation of targets RENARD GRAY and JERMAINE REYNOLDS, two residents of Philadelphia who have conspired to illegally deal in firearms without a license in violation of Title 18, United States Code, Section 922(a)(1). As detailed herein, the evidence adduced by this investigation has also established that GRAY distributed 28 grams or more of a mixture and substance containing cocaine base ("crack"), in violation of Title 21 United States Code, Section 841(a)(1), (b)(1)(B).

1

## PURPOSE OF AFFIDAVIT

4.      This affidavit is provided in support of a Criminal Complaint and Arrest Warrant charging GRAY with (a) dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1); and (b) knowingly distributing a controlled substance in violation of Title 21 United States Code, Section 841(a)(1), (b)(1)(B).

5.      Section 922(a)(1)(A)  provides that it shall be unlawful for any person except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce.

6.      As used in Section 922(a)(1)(A), "engaged in the business" means: "[a]s applied to a dealer in firearms, . . . a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms...." 18 U.S.C. § 921(a)(21)(C). The phrase "with the principal objective of livelihood and profit" means "that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 18 U.S.C. § 921(a)(22).

7.      Title 21 United States Code, Section 841(a)(1) provides that it shall be unlawful for any person to knowingly or intentionally distribute or possess with intent to distribute a controlled substance, including cocaine base ("crack"). Section 841(b)(1)(B) imposes a mandatory five-year term of imprisonment upon any person who violates this Section by possessing 28 grams or more of a mixture or substance containing cocaine base ("crack").

2

8.    I am familiar with the information contained in this affidavit through my own investigation and/or from my discussions with other law enforcement officers and witnesses. This affidavit is intended to show that there is probable cause for the requested arrest warrant. It does not contain all of the information known to me or developed in the course of the investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

9.    ATF commenced an investigation into GRAY and REYNOLDS in June 2017 after receiving information from a confidential source that GRAY and REYNOLDS had been offering for sale and selling firearms without a license. After a period of observation and investigation, ATF succeeded in introducing GRAY to an undercover law enforcement officer, referred to here as UC, who was then posing as a private citizen interested in purchasing black market firearms.

10.    GRAY and UC first met in September 2017. During their initial meeting—which was covertly surveilled and recorded by ATF—GRAY and UC discussed potential firearms transactions as well as the manner by which GRAY and his co-conspirators trafficked guns into Philadelphia. Among other things, GRAY told UC that he had a firearm supplier who could only be dealt with over the telephone, who was responsible for shipping guns to Philadelphia. GRAY further stated that another co-conspirator was "up here." According to Gray, this person held guns for him and was "my right hand man." "To ya'll," Gray told UC, "it's the same group of people." After some further discussion, Gray agreed to sell firearms to UC and provided UC with a telephone number at which GRAY could be reached. Later that same day, GRAY called UC and the two agreed to meet within a few days to conduct a firearms transaction.

11.    On September 19, 2017, GRAY and UC spoke again, and the two planned to meet to conduct a firearm purchase transaction. The two met soon thereafter, as planned, and GRAY provided UC with a tan plastic bag and a cardboard box containing two semiautomatic pistols. UC

3

complained that he/she had understood GRAY would be bringing more guns, and GRAY responded by saying that he had planned to bring more guns but had sent some "back" because he wanted better guns. In exchange for the two pistols, UC provided GRAY with $1,100 in pre-recorded government funds. The two also discussed transacting more firearms in the future before GRAY took the money and departed the area. This transaction was covertly recorded by ATF.

12.     On September 23, 2017, UC received a series of text messages from GRAY, which included a picture of six handguns and a request that UC contact GRAY as soon as possible. A few minutes later, UC received an incoming call from GRAY. During the call, GRAY stated that he could sell UC five of the six guns from the picture he had just texted. UC said he was interested, and GRAY responded that he would check with "his boy" because he wanted to "grab them jawns." The two agreed to meet later in the day to conduct the gun transaction. Based on my training and experience, in this context, "jawns" refers to firearms.

13.     Later that afternoon, UC sent a text message to GRAY, asking if GRAY had the guns. GRAY responded by text, providing an address for the meet location. The two planned to meet at 4:30 p.m. At approximately 4:27 p.m., ATF agents observed a black Audi SUV, known to belong to GRAY, drive up and park in front of a residence on the 300 block of Walnut Lane in Philadelphia, which belongs to REYNOLDS. According to county probation and parole records, REYNOLDS has listed 329 E. Walnut Lane, Apt. 1, Philadelphia, PA, as his primary residence and reported from that address until his probation expired in April 2016. ATF has also consistently observed REYNOLDS at this location using electronic and human surveillance.

14.     GRAY then exited his vehicle and entered REYNOLDS' residence. Roughly 10 minutes later, GRAY exited REYNOLDS' residence holding a yellow plastic bag that appeared to be weighed down by objects inside. GRAY's Audi SUV was thereafter observed leaving the area.

4

15.     At approximately 5:24 p.m., investigators observed GRAY's Audi SUV arrive at the place where GRAY and UC had planned to meet. UC was already waiting at that location. GRAY exited his vehicle with a yellow plastic bag in his hand, walked over to UC's vehicle, and entered the passenger side. Inside the yellow bag were four semiautomatic handguns. GRAY explained that the two other guns pictured in his text had already been sold to others. He then provided the four firearms to UC in exchange for $2,800 in prerecorded government funds. GRAY exited UC's vehicle, reentered his Audi SUV, and departed from the area. This transaction was covertly recorded by ATF.

16.     On October 2, 2017, GRAY and UC spoke again by telephone and again arranged to conduct another firearms transaction. Later that day, GRAY and UC met a prearranged location in Philadelphia, PA. ATF surveillance units observed GRAY arrive at the meet location alone, driving an Infiniti sedan. While holding a white plastic bag in his hand, GRAY exited the Infiniti sedan and entered UC's vehicle. GRAY then provided the white plastic bag to UC. Inside the bag, was an assault rifle, disassembled in two pieces, and wrapped cellophane. UC purchased this firearm from GRAY in exchange for $1,500 in prerecorded government funds. After the transaction, UC and GRAY engaged in further conversation about additional business activities that GRAY was involved in. Among other things, GRAY stated that he knew of several individuals who would buy "brand new straps and bring them to me...in exchange for crack." Based on my training an experience, "straps" refers to firearms and "crack" refers to cocaine base. UC then asked GRAY where he acquired crack and stated that his former crack source was no longer reliable. GRAY responded by offering to sell crack to UC. GRAY also reported that he had access to cocaine and could readily "get someone to cook it up." After some further discussion of prices and quantities, UC agreed to purchase crack cocaine from GRAY.

5

17. In UC's presence, GRAY then called his crack supply contact on the telephone. During this conversation, UC heard Gray tell his supplier that he had a purchaser interested in crack, who had "enough bread on him." After the telephone call, GRAY told UC that his crack supplier typically dealt only in large quantities, stating "he doesn't break it down. He sells it raw. He sells a whole key." Based on my training and experience, key refers to a kilogram of cocaine. After some further conversation, GRAY and UC agreed to return to the same location to meet again later in the day to conduct the drug transaction. GRAY then departed from the area. Roughly two hours later, GRAY and UC returned to the meet location, as arranged. GRAY handed UC a bag containing a white chunky substance that appeared to be crack cocaine. UC asked Gray to confirm the quanity of the crack, saying "56 right?" (referring to 56 grams). GRAY replied "Yep...2 ounces..." In exchange for the drugs, UC provided Gray with $2,500 in prerecorded government funds. After some further discussion about future firearms transactions, GRAY departed from the area.

18. A field test conducted on the white chunky substance provided to UC by GRAY confirmed the presence of crack cocaine. The substance, and the thin plastic baggie containing it, was then weighed and determined to weigh approximately 56.1 grams.

19. At all times relevant to this investigation, neither GRAY nor REYNOLDS held a license to sell or deal in firearms.

## CONCLUSION

20. Based on the above information, and my experience and training as an ATF special agent, I believe there is probable cause to arrest GRAY for (a) dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1); and (b) knowingly distributing a

6

mixture or substance containing cocaine base ("crack"), in violation of Title 21 United States Code, Section 841(a)(1), (b)(1)(B).

Respectfully submitted,

CHARLES M. RAMSEY
ATF Special Agent

Subscribed and sworn to before me this _18th_ day of November, 2017,

s/ Linda K. Caracappa by McDonnell (AUSA) per
HON. LINDA K. CARACAPPA telephone authorization
United States Chief Magistrate Judge on Nov. 18, 2017 at
4:00pm

11/21/2017

7